CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
August 05, 2024
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| LAURA B.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 7:23-CV-00463 |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY,[2] | ) | |
| Commissioner of Social Security, | ) | By: C. Kailani Memmer |
| | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Laura B. ("Laura") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. This case is before me by referral§ 636(b)(1)(B). Neither party requested oral argument and it would not aid in the decisional process; therefore, this case is ripe for decision. For the reasons detailed below, I respectfully recommend that the presiding District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

The court limits its review to a determination of whether substantial evidence exists to support the Administrative Law Judge's ("ALJ") conclusion that Laura failed to demonstrate that she was disabled under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which

evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig v. Chater*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate her findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## CLAIM HISTORY

On March 11, 2021, Laura filed an application for DIB, alleging disability beginning on November 6, 2020. R. 11. The Commissioner denied Laura's claim initially on July 16, 2021, and

---

has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work; instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. *See* 42 U.S.C. § 423(d)(2).

on reconsideration on December 1, 2021. *See* R. 232–53. Thereafter, Laura requested a hearing

before the ALJ. R. 273–75. On June 13, 2022, Laura appeared before ALJ Gwendolyn Hoover by

telephone with her attorney, Gary C. Hancock. R. 11. Martin Kranitz testified at the hearing as an

impartial vocational expert. *Id*. On August 12, 2022, the ALJ entered a decision analyzing Laura's

claims under the familiar five-step process[4] and denied her request for benefits. R. 11–27.

At the first step, the ALJ found that Laura had not engaged in substantial gainful activity

since November 6, 2020, the alleged onset date. R. 13. At the second step, the ALJ found that

Laura has the following severe impairments: degenerative disc disease of the lumbar spine,

degenerative disc disease of the cervical spine, cervical radiculopathy, osteoarthritis of the left

shoulder, osteoarthritis of the left hand, chronic pain syndrome, diabetes, and obesity. *Id*.

At the third step, the ALJ found that Laura's impairments, either individually or in

combination, did not meet or equal a listed impairment. R. 16–19. The ALJ specifically considered

Laura's severe impairments, including Listings 1.15 (disorders of the skeletal spine resulting in

compromise of a nerve root), 1.16 (lumbar spinal stenosis resulting in compromise of the cauda

equina), and 1.18 (abnormality of a major joint(s) in any extremity) *Id*.

The ALJ concluded Laura retained the residual functional capacity ("RFC") to:

perform light work as defined in 20 CFR 404.1567(b) however she would be
limited to frequent balancing, occasional climbing of ramps and stairs, occasional

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether
the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the
requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can
perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20
C.F.R.§ 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460-62, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983).
The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §
404.1520(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie
case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant
maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work
experience, and impairments, to perform available alternative work in the national economy. 42 U.S.C. §
423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

stooping, kneeling, crouching, and crawling, and occasional reaching in all
direction with the left upper extremity. She could never climb ladder, ropes, or
scaffolds. She is limited to frequent handling and fingering with the left upper
extremity. She would need to avoid concentrated exposure to vibration and hazards
such as unprotected machinery and heights.

R. 19.

At the fourth step, the ALJ found that Laura is able to perform past relevant work as an

accounts payable clerk, DOT #210.382-014, actually performed at the sedentary and light

exertional levels but generally performed at the sedentary exertional level. R. 26. The ALJ

concluded Laura's past relevant work as an accounts payable clerk was not precluded by her RFC.

*Id*. Thus, the ALJ concluded a finding of "not disabled" was appropriate. R. 27. Laura appealed

the ALJ's decision, and on May 30, 2023, the Appeals Council denied her request for review. R.

1–7. This appeal followed.

## FACTS

### A. Laura's Background and Testimony

Laura was born on April 28, 1968. R. 182. Laura has a high school equivalent education.

R. 189. Laura took some college courses but did not obtain a college degree. *Id*. Laura has prior

work experience as an accounts payable clerk. *See* R. 190, 209–10.

At the time of the June 13, 2022, hearing, Laura was 5'4'' and weighed 195 pounds. R.

191. Laura testified she has a valid driver's license but drives "very minimal[ly] due to the turning

of [her] head." *Id*. She will drive six miles to and from the grocery store "maybe once every two

weeks." *Id*. Laura testified she stopped working in November 2020 due to her medical impairments

and was terminated from her job in April 2021 following the exhaustion of her medical and

personal leave. R. 193.

Laura testified that her primary medical issues are with her neck, left arm, and her lower

back. *Id*. Laura claimed she had "fatty liver issues" and her "large toe on the left was fused" but

4

these medical ailments were not causing her any symptoms. *Id*. As for her neck and left arm, Laura testified she had surgery at UVA in 2018, but her neck and left arm issues returned in 2020. R. 194. She experiences tingling and muscle spasms in her neck and left shoulder and arm. *Id*. She also experiences headaches associated with the problems with her neck and left arm. *Id*. Laura testified she experiences constant, daily pain in her neck and left arm and hand. R. 195. Laura is prescribed Oxycodone which causes the side effect of itching for which she takes Benadryl. *Id*. Laura receives treatment for her pain from Dr. Baylor and Ms. Perdue at Blue Ridge Pain Management. R. 195–96. She sees Dr. Baylor and Ms. Perdue every month and a half. R. 196.

As a result of her neck and left arm issues, Laura testified she spends a portion of her day resting or reclining. *Id*. Laura has issues standing as it feels like she has a lot of weight on her shoulders, neck, head, and arm, and sitting causes her left hand and arm to tingle. *Id*.  She uses a recliner to rest her head and back to relieve the pain, which helps but does not relieve it "even 50%." *Id*. Engaging in chores, such as dishes or laundry, using her left arm and hand causes "[e]xcruciating pain" and she cannot do it "more than five minutes." *Id*. She cannot stand and wash dishes as she experiences "excruciating pain" in her neck, arm, shoulder, and lower back, and her legs tingle and feel numb. R. 198. Laura testified she drops things when attempting to hold items with her left arm and hand. R. 196. Doctors have discussed additional surgery on her neck, but her doctors at Blue Ridge Pain Management state she "had over 2/3 surgery on [her] neck and to do anymore surgeries could cause more harm than good …." R. 197.

Laura testified her pain "drains every bit of [her] energy" causing fatigue and sleepiness. *Id*. This causes her to lay down and rest during the day. *Id*. Her energy level during the day is "[n]ot good." R. 198.

When driving, Laura avoids roads with stop signs as it causes her great pain when having to stop and look both ways before proceeding. R. 197. When turning her neck to the left or right or up and down, her neck "pulls and . . . burns, and it starts hurting." R. 198. If she has to reach overhead or in any other direction in front of her body, "[i]t pulls" in her arm, shoulder, and neck. R. 198–99.

Laura testified she had two surgeries on her lower back over 20 years ago. R. 200. When she last worked in 2020,  her back caused issues when standing up requiring her to hold onto something for balance until she was stable enough to walk. *Id*. Her back pain has gradually worsened over recent years. *Id*. When she had an MRI on her lumbar spine in April 2021 which reflected severe impingement, Laura testified her doctors did not suggest additional surgeries on her back. R. 201. When she has attempted to sit at a computer, Laura she experienced excruciating pain after less than 15 minutes. *Id*.  She also experiences "tingling, numbing, needle sticking type" pain in her left leg and foot. R. 200.

As for daily activities, Laura testified her ex-husband does her laundry as she is unable to lift the laundry basket. R. 199. Laura drives to the grocery store and shops for groceries alone. *Id*. She does not have anyone help her with other chores at home. *Id*. Laura testified she has given up several of her hobbies, including gardening. R. 201.

Laura testified she has difficulty with buttoning her shirt and pants and fastening and unfastening her bra. R. 201–02. If she sits in the car for too long it "really bothers [her] lower back." R. 202. She is unable to use a rubber band in her hair because her "hands will not work right with it." *Id*. She is unable to curl her hair or wear earrings or a necklace because it requires holding her arms up which she cannot do. *Id*. She is unable to use her left hand to cut her fingernails on her right hand as she "can't make [her] fingers work right to do [it]." *Id*. Reaching her hands

out in front of her body even for a few minutes puts pressure on her neck and left shoulder and arm. R. 202–03. Laura testified that Oxycodone "might knock the edge barely off" her constant pain, but "nothing actually cures it." R. 203. Laura testified she takes Gabapentin for tingling, but it "does not really help." *Id*. Laura does not use alcohol or any other type of self-medication for her pain. *Id*.

In February and March 2022, Laura testified she did not take Oxycodone as prescribed. R. 205. Laura claimed the prescription states she is to take "one as needed a day and unless it is extremely, extremely bad" she does not take it because of concerns of possible addiction due to Oxycodone being an opioid. *Id*. As for frequency, Laura testified she will take Oxycodone twice a day, six to eight hours apart, and then after taking it consistently for a few days she will take a break from it, whether she is hurting or not, so she does not become addicted to the medication. *Id*. From May 2020 until the date of the hearing, Laura testified she would take Oxycodone three days a week, sometimes twice in one day. R. 206. Laura testified her prescribing doctor, Dr. Baylor, told her she could take as many as four Oxycodone per day, but she is scared to take this amount due to addiction concerns. R. 207.

**B. Medical History Overview**

On February 6, 2018, Laura had a cervical fusion at C3-C7 for cervical spondylosis with myelopathy and radiculopathy. R. 456.

On October 27, 2020, Laura presented for a follow-up appointment at the Neurosurgery Clinic at the University of Virginia. *Id*. Laura reported she had done well over the years since her cervical fusion, but recently started having worsening left sided neck pain, muscle spasms, headaches and left-hand numbness and tingling, similar to the pain she experienced prior to her surgery. *Id*. Laura noted mild balance troubles, but no issues with hand dexterity or changes in her

bowel or bladder habits. *Id*. Laura underwent x-rays of her spine which showed moderate discogenic disease and osteoarthritis at all levels, but her spine alignment was intact with no dynamic instability or fracture. R. 461. Upon examination, Laura was observed to not be in acute distress, her neck was tender to palpation, she had some evidence of left sided paraspinous muscle spasms, her arms and legs were nontender, she had normal muscle bulk and tone and full 5/5 strength in upper and lower limbs, including grip strength, her sensation was intact throughout to light touch, and her gait was normal. R. 457–58. Laura underwent a cervical CT scan which showed no abnormalities. R. 458. An MRI was recommended to better evaluate for radiculopathy of the nerve roots. *Id*. Laura was provided a prescription for physical therapy to focus on pain relieving strategies to include dry needling for muscle spasms. R. 459.

On November 9, 2020, Laura called her neurologist's office and claimed she felt a "pinching" feeling in her neck. R. 455. Laura was "almost to tears" stating her "arm [was] killing her and [it was] scaring her." *Id*. A few hours later, Laura reported severe muscle spasms in her left shoulder. *Id*. Laura's primary care physician started her on Lyrica on November 6, 2020, to treat her pain, along with the advice to apply heat to her shoulder, but Laura reported no pain relief. *Id*. Laura was then switched from Lyrica to Gabapentin 300mg three times a day. R. 456.

On November 23, 2020, Laura presented to the care of Reza Salajegheh, M.D., to begin pain management treatment for her neck and left shoulder with radiation to her left upper extremity. R. 452. Laura reported her current pain intensity as 6/10. *Id*. An MRI from a few weeks prior showed a stable post anterior cervical fusion at C3-C7, chronic osteophyte formation encroaching on the cervical cord at C5-C6, worse on the left than the right. R. 453. The MRI also showed Laura's cervical cord was normal in size and signal intensity throughout, and she had no

disc herniation or progressive central canal stenosis. *Id*. She received a cervical epidural steroid injection to treat her pain symptoms. *Id*.

On December 4, 2020, Laura had a follow-up appointment with her pain management physician at UVA Pain Management Center. R. 446–51. Laura reported 1-2 days of relief from her injection, and claimed she was unable to rotate her head due to pain. R. 447. However, upon examination, her neck exhibited a normal range of motion and she ambulated with a nonantalgic gait without any assistive devices. R. 449. Laura reported neck pain with a severity of 4/10 and a "tingling" feeling. *Id*. Gabapentin was increased to 900mg three times a day. R. 450. For further relief for her neck pain, Laura's prescription for Robaxin was switched to Baclofen 10mg three times a day, when necessary. *Id*.

On December 22, 2020, Laura was evaluated by physical therapist Kenny Broeker. R. 1003. Laura reported burning pain in her neck and left shoulder region that radiated down her left arm and causing numbness and tingling in her arm and fingers. *Id*. Laura reported she had left hand weakness causing her to drop things and requiring her to use her right hand. *Id*. Laura claimed she frequently would wake up in the middle of the night with pain, numbness, and tingling down her left arm. *Id*. Mr. Broeker observed Laura walk approximately 500 feet with no observable gait deviation. R. 1004. Laura's cervical and left shoulder range of motion and strength were reduced, and her left grip was weaker than her right. *Id*.

On February 5, 2021, Laura had a follow-up appointment with her pain management physician at UVA Pain Management Center. R. 440. Laura reported her pain moved to her right side. *Id*. She also reported her pain increased when sitting in front of a computer. *Id*. Laura confirmed she was taking Gabapentin 900mg three times a day, which she tolerated well, but did not fill her Baclofen due to concern for abuse on the part of her teenage granddaughter. *Id*.  Laura

reported neck pain with a severity of 3/10 and a feeling of "burning, dull, sharp and shooting." *Id*. Upon examination, Laura had a full range of motion in her neck, and she walked with a normal gait without any assistive devices. R. 443.

On March 3, 2021, Laura had a new patient evaluation for cervicalgia and radiculopathy pain management with Emma Perdue, PA-C. R. 673. Laura reported her pain began the following year describing the pain as "piercing, sharp, shooting." *Id*. Laura claimed her pain was alleviated by exercise, but exacerbated by rest, lying down, sitting, standing, and walking. *Id*. Upon examination, Laura was pleasant and not in acute distress, exhibited a significantly decreased range of motion of her cervical spine and a full range of motion of her back, exhibited 5/5 strength in her right arm with full range of motion and intact sensation and 4/5 strength in her left arm with decreased sensation and limited range of motion in abduction, and normal gait. R. 674. Laura was assessed to have chronic pain syndrome, analgesic use, cervical radicular pain, cervicalgia, cirrhosis, and tobacco use. R. 675. In discussing treatment options for chronic pain syndrome, Laura relayed she was hesitant for any type of intervention, including surgery or injections. *Id*.

On March 29, 2021, Laura had a follow-up appointment regarding her pain management at Blue Ridge Pain Management Associates. R. 677. Laura reported a pain severity of 5-6/10 and complained of pain in her neck running into her left shoulder and arm. *Id*. She also complained of lower back pain. *Id*. Laura was prescribed Tramadol 50mg, 1 tablet as needed every 6 hours, and scheduled to receive a cervical epidural steroid injection for pain. R. 678. Laura's findings on exam were consistent with her March 3rd examination. *Id*.

On April 14, 2021, Laura presented for a cervical epidural steroid injection. R. 682. Laura reported a pain severity of 6/10. *Id*. Laura reported she had no new medical problems and was able to perform instrumental activities of daily living. *Id*.  On April 20, 2021, an MRI of Laura's lumbar

spine showed a stable post decompressive surgery at L3-L5. R. 671. Laura had chronic degenerative bulging disc osteophyte complexes particularly at L3, L4, and L5, and foraminal stenosis similar to a prior study in 2017 with severe impingement at L4 on the left. *Id*.

On May 13, 2021, Laura had a follow-up appointment regarding her pain management at Blue Ridge Pain Management Associates. R. 757. Laura reported the cervical epidural steroid injection and her newly prescribed Tramadol were not effective in reducing her pain. R. 758. Laura requested other alternatives to help reduce her pain. *Id*. Laura's Tramadol prescription was replaced with Oxycodone HCI tablets, 5mg as needed, three times a day. *Id*. Laura was advised to consider spinal cord stimulation therapy. R. 759. Laura's findings on exam were consistent with her March 29th examination. R. 758.

On June 17, 2021, Laura had a follow-up appointment regarding her pain management with Ms. Perdue at Blue Ridge Pain Management Associates. R. 753. Ms. Perdue's treatment notes reflect Laura was allergic to Oxycodone but continued to take it with Benadryl to manage the side effects. *Id*. Laura reported she was willing to consider spinal cord stimulation therapy as prior interventions were not helpful in managing her pain, as she failed surgical options and was allergic to pain medications. *Id*. Laura's Oxycodone prescription was replaced with a weekly Butrans patch, 10mcg/hr, and her Gabapentin, 900mg, three times a day, was refilled. R. 754. Laura's findings on exam were consistent with her May 13th examination. *Id*.

On July 2, 2021, Laura presented for a medication management appointment. R. 724. Upon examination, Laura was in no acute distress, her neck was supple, she denied joint pain, she was neurologically intact, and she exhibited normal musculoskeletal range of motion and gait. R. 725.

On July 22, 2021, Laura had a follow-up appointment for pain management with Ms. Perdue at Blue Ridge Pain Management Associates. R. 749. Laura reported she was no longer

interested in spinal cord stimulation therapy which resulted in a cancellation of the referral for treatment. *Id*. Ms. Perdue's treatment notes reflect Laura took her medications "very sparingly and was even afraid to try [b]utrans" noting the prescription was sent about a month ago and she applied her first patch yesterday. *Id*. At the time of the appointment, the Butrans patch had not provided any pain relief. *Id*. Laura's findings on exam were consistent with her June 17th examination. R. 750.

On August 19, 2021, Laura had a follow-up appointment for pain management with Ms. Perdue at Blue Ridge Pain Management Associates. R. 745. Laura reported the Butrans patch was "minimally effective" but did not cause a severe allergic reaction, only slight skin irritation. *Id*. Laura claimed her pain remained at 8/10 throughout the day. *Id*. Laura's findings on exam were consistent with her July 22 examination. R. 746. Laura's Butrans prescription was replaced with Belbuca, 300mcg, every twelve hours, and her Gabapentin prescription was refilled. *Id*.

On October 7, 2021, Laura had a follow-up appointment for pain management with Ms. Perdue at Blue Ridge Pain Management Associates. R. 866. Laura reported she was taking her medications "very sparingly" and that she was taking Belbuca "as needed." *Id*. Ms. Perdue noted one box of Belbuca lasted over two months (although prescribed to be taken within 30 days). R. R. 863, 866. Laura reported that when she does take Belbuca it is "about 60% effective for pain." R. 866. Laura reported a pain severity of 6/10. *Id*.

On December 2, 2021, Laura had a follow-up appointment for pain management with Ms. Perdue at Blue Ridge Pain Management Associates.  R. 859. Laura reported she continued to take her Gabapentin regularly and her Belbuca sparingly. *Id*. Dr. Perdue noted one box of Belbuca lasted over two months as her last box was prescribed in October 2021. *Id*. Ms. Perdue refilled

Laura's Gabapentin and Belbuca prescriptions. R. 860. Laura's reported pain relief from medication and exam findings remained consistent from her last appointment. *Id*.

On January 31, 2022, Laura presented to the emergency department at New River Valley Medical Center complaining of chronic neck pain and headache after she slipped and fell on ice six days prior. R. 1166. She also complained of chronic tingling in her left upper and lower extremity, weakness in her left hand, and left wrist pain. *Id*. Laura underwent testing on her head, cervical spine, and left wrist which all resulted in negative findings. R. 1170–71. Her assessment noted suspect acute exacerbation of her chronic neck pain. R. 1172. Laura was treated with a lidocaine patch and Toradol with improvement of symptoms and was discharged in stable condition. *Id*.

On February 3, 2022, Laura had a follow-up appointment for pain management with Ms. Perdue at Blue Ridge Pain Management Associates. R. 1015. Laura reported she did not finish her Belbuca because it was ineffective. *Id*. When she was prescribed Oxycodone, Laura reported she would take about a half a pill per day which was "very helpful" for pain relief. *Id*. She continued to take Gabapentin which was "about 20% effective" as her sole source of pain relief. *Id*. Laura continued to report a daily pain severity of 6/10. *Id*. Laura noted she was "able to do most ADLs but has a lot of difficulty with household chores." *Id*.  Laura reported she fell on ice the previous week causing a mild headache, but she was "doing ok overall." *Id*. Ms. Perdue refilled Laura's Gabapentin and replaced Belbuca with a daily dose of Oxycodone, 5mg. R. 1016.

On February 17, 2022, Laura attended an appointment for a medication check. R. 925. Laura complained of pain in her joints, muscles, back and neck. R. 926. Upon examination, Laura was in no acute distress, her neck was supple, and she exhibited normal musculoskeletal range of motion and gait. R. 928.

On February 19, 2022, Laura was involved in a motor vehicle accident while driving. R. 895. Laura reported to Lewis Gale Hospital following the accident complaining of neck, lower back, and knee pain. *Id*. Upon examination, Laura was alert and in no acute distress, and her neck was atraumatic and supple. R. 896. Laura's back exhibited a full, painless range of motion, she had no motor deficits, and her sensation was intact. R. 897. Imaging of Laura's left knee and cervical spine were unremarkable. R. 897–99, 902. Laura had no apparent injury from the accident and was discharged. R. 900.

On March 3, 2022, Laura had a follow-up appointment for pain management with Ms. Perdue at Blue Ridge Pain Management Associates. R. 1012. Laura reported Oxycodone provided "another 20-30% relief with each half dose." *Id*. However, Laura participated in a drug screen which was negative for Oxycodone at this appointment. R. 1026. Ms. Perdue noted Laura was healing appropriately from her motor vehicle accident in February. *Id*. Laura's exam findings remained consistent. *Id*.

On May 4, 2022, Laura had a follow-up appointment for pain management with Dr. George Baylor at Blue Ridge Pain Management Associates. R. 1061. At this appointment, Laura reported no new medical problems or medications. *Id*. Laura's pain severity at the appointment was 6/10. R. 1062. Laura reported her pain and weakness was getting worse and she experienced only 30% pain relief with her current medication so Dr. Baylor increased Laura's Oxycodone intake to every 6 hours. *Id*. Laura's examination remained the same as her previous pain management appointments. *Id*.

On May 29, 2022, Laura presented to the emergency department at Carilion Clinic with complaints of constant left wrist pain. R. 1148. Laura reported her pain was not relieved with her prescribed Oxycodone and the use of a brace for her carpal tunnel syndrome worsened the pain.

*Id.* Upon examination, she was not in acute distress, she had 4+/5 strength in her left upper extremity with intact pulse and sensation, she was able to move all extremities well, and carpal tunnel testing was negative. R. 1151. Laura underwent an x-ray on her left wrist which findings showed no acute osseous abnormality. R. 1152.

On June 6, 2022, Laura presented to the care of Margaret Tuck, PA-C at Carilion Clinic Orthopaedic Surgery for an evaluation of left-hand pain and numbness. R. 1208. Laura reported numbness and tingling in her whole left hand which radiated up into her arm and difficulty gripping and with small motor movements. *Id.* Upon examination of her left upper extremity, Laura fully extended her fingers and thumb, made a fist, and had full range of motion of her wrist with very minimal pain. R. 1212. Laura was able to perform thumbs up, the "OK" sign, and cross her fingers. *Id.* She also had no hand muscle atrophy. *Id.* An evaluation of the right upper extremity was completed to compare to Laura's left upper extremity. *Id.* Laura's range of motion, sensation, and strength for her right side were all equivocal to her left side. *Id.* Laura was assessed to have possible carpal/cubital tunnel syndrome and an EMG/nerve conduction study was ordered for further evaluation. R. 1213.

### C. Medical Opinion Evidence

On December 22, 2020, Kenny Broeker, PT, conducted a functional performance simulation to assess whether Laura could return to work capacity. R. 991. Upon examination, Laura's pain went from 4/10 at the start of the session to 8.5/10 at the end of the session, along with increased tingling and numbness in her left hand and fingers. *Id.* Her power grip strength did not decrease after the session, but her pincer grip strength decreased from 9 pounds to 7 pounds with her right hand and 6 pounds to 3.5 pounds with her left hand. *Id.* Her shoulder flexion, abduction, IR (impulse responses), and ER MMT (external rotation manual muscle test) force

15

output all decreased significantly and were more painful by the end of the session bilaterally. *Id*. Laura displayed significant fatigue in all tasks requiring multiple repetitions and she was unable to lift more than 15 pounds in any plane of movement. *Id*. Laura exhibited minor cervical motion during the simulated workstation activities due to increase in pain and she was unable to tolerate more than 2 minutes without needing a break due to neck and shoulder pain and fatigue. *Id*. Mr. Broeker opined that based upon Laura's description of her work activities, she may not be required to do each of the performed activities in conjunction during a normal workday; however, from his findings, he noted that it appeared likely that Laura would be unable to work a full workday without fatiguing and/or significantly increasing in pain. *Id*.

On July 7, 2021, as part of the initial disability determination, state agency medical consultant Richard Surrusco, M.D., reviewed Laura's record and provided an RFC assessment. R. 237–40. Dr. Surrusco determined that Laura was capable of occasionally lifting/carrying up to 20 pounds, frequently lifting/carrying up to 10 pounds, standing/walking about 6 hours in an 8-hour workday, and sitting about 6 hours in an 8-hour workday. R. 237–38. Dr. Surrusco found Laura was capable of a light RFC "because her condition decreases her range of motion, but she maintains 5/5 strength." R. 238. Dr. Surrusco further found that Laura could occasionally climb ramps/stairs and ladders/ropes/scaffolds, frequently balance, and occasionally stoop, kneel, crouch, and crawl. *Id*. Dr. Surrusco also found Laura could occasionally reach overhead with her left arm due to her limited/decreased range of motion and had no limitations regarding reaching in front of her, gross and fine manipulation, and feeling. R. 239. Due to impingement, Dr. Surrusco found Laura should avoid concentrated exposure to vibration and hazards, including heights. *Id*.

On October 7, 2021, Emma Perdue, PA-C, one of Laura's treating physicians at Blue Ridge Pain Management, filled out a medical opinion questionnaire regarding Laura's cervical

radiculitis. R. 856–57. Ms. Perdue opined that Laura could sit, stand, and walk for less than 2 hours each during an 8-hour workday. R. 856. She further opined that Laura could occasionally lift less than 10 pounds and could never lift 10 or more pounds. *Id*. She also opined that Laura's pain or other symptoms were severe enough to constantly interfere with attention and concentration, her impairments were likely to produce "good days" and "bad days," she would likely be absent from work more than 4 days a month due to her impairments or treatment, and that these limitations would relate back to Laura's disability onset date of November 6, 2020. R. 857. Ms. Perdue's opinion is provided in a "check box" format without additional commentary. *Id*.

On December 1, 2021, as part of the reconsideration level of disability determination, state agency medical consultant Bert Spetzler, M.D., reviewed Laura's record and provided an RFC assessment. R. 249–51. Dr. Spetzler agreed with Dr. Surrusco's findings other than the determination that Laura could never climb ladders, ropes, or scaffolds, and she had no environmental limitations. *See* R. 249–50. Dr. Spetzler summarized the medical evidence in reaching his conclusions. R. 250. Additionally, Dr. Spetzler reviewed new medical records submitted after the initial decision and found such new evidence did not support additional limitations. R. 251.

On May 2, 2022, George Baylor, M.D., who treated Laura at Blue Ridge Pain Management along with Ms. Perdue, noted agreement with Ms. Perdue's October 7, 2021, opinion and confirming such limitations therein would still apply. R. 1056. Dr. Baylor opined that the limitations would continue for an additional 12 months. *Id*. As for Laura's right and left upper extremities, Dr. Baylor found Laura could never reach in any direction or push/pull with either arm, could occasionally finger, and could frequently handle. *Id*. He further opined that Laura could

sit with her head in a fixed position for a sustained period of time, but she could not rotate her head to the right and to the left for a sustained period of time. R. 1056–57. Dr. Baylor's opinion is provided in a "check box" format without additional commentary. *Id*.

### D. Evidence Submitted to the Appeals Council after the ALJ Decision

Laura submitted additional medical records following the ALJ's decision. As discussed below, Laura argues the Appeals Council wrongly found such new evidence did not warrant remand. ECF No. 10 at 13–16.[5]

On June 22, 2022, Laura presented to the care of Bradley McCrady, D.O., at the Institute for Orthopaedics and Neurosciences. R. 128–33. Laura reported recent deep mid-forearm pain with radiation of numbness into her entire left hand along with issues dropping items. *Id*. Laura underwent an EMG study on her left upper extremity which showed evidence of carpal tunnel syndrome in her left wrist. *Id*. The EMG also showed there was no evidence to suggest a peripheral polyneuropathy or left lower cervical motor axonal loss radiculopathy. *Id*. As a result of such examination, Laura was scheduled for carpal tunnel surgery. On July 13, 2022, Laura had a left open carpal tunnel release procedure. R. 169.

On March 1, 2023, Jonathan Saks, M.D., Laura's primary care physician, provided a medical opinion regarding Laura's limitations. R. 61–62. Dr. Saks opined Laura could sit, stand, or walk less than two hours each in an 8-hour workday. R. 61. He further opined that Laura could occasionally lift and carry less than 10 pounds but could never lift or carry 10 pounds or more. *Id*. Dr. Saks also opined Laura could occasionally handle with her right hand, but never reach in any direction, finger, or push/pull with her right hand. *Id*. As for her left hand, Dr. Saks opined Laura

---

[5] As Laura references only a portion of the new medical records in her argument regarding the Appeals Council's determination, I have included a summary of only those records for which Laura addresses in her brief.

could never reach in any direction, handle, finger, or push/pull. R. 61–62. Dr. Saks noted Laura

could hold her head in a fixed position. R. 62. Dr. Saks further opined Laura's pain or symptoms

were severe enough to constantly interfere with her attention and concentration. *Id*. He noted

Laura's impairments were not likely to produce "good days" and "bad days." *Id*. Dr. Saks claimed

his opinion related back to November 6, 2020, Laura's alleged disability onset date. *Id*. Dr. Saks

provided his opinion in a "check box" format with the following commentary: "Patient's physical

pain and limited mobility prevent her from being able to work at this time. From my perspective,

she meets the criteria for federal disability benefits." *Id*.

## ANALYSIS

I.    **ALJ's Evaluation of the Medical Opinion Evidence**

Laura claims the ALJ failed to adequately consider the medical opinions of her treating

medical providers, Dr. Baylor, Ms. Perdue, and Mr. Broeker, in that the ALJfailed to explain her

rationale for finding their opinions unpersuasive. ECF No. 10 at 4–10.

Because Laura applied for disability benefits on or after March 27, 2017, the ALJ applied

the new social security regulations for evaluating medical opinions. *See* R. 19, 23–26 (citing 20

C.F.R. § 404.1520c). Under the new regulations, the ALJ may not "defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. §

404.1520c(a). Rather, the ALJ must consider the persuasiveness of all medical opinions in the

record using five factors: supportability, consistency, relationship with the claimant,

specialization, and other factors that tend to support or contradict a medical opinion. *See* 20 C.F.R.

§ 404.1520c(c).

Although an ALJ may consider all five factors, "the most important factors"

are supportability and consistency. 20 C.F.R. § 404.1520c(a), (b)(2). The supportability factor

focuses on the information relied upon and explanation provided to endorse the medical source's findings: "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). The consistency factor, on the other hand, compares the source's findings to evidence from other sources: "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). The ALJ must explain in his decision how he considered the supportability and consistency factors for each medical opinion in the record. 20 C.F.R. § 404.1520c(b)(2). The ALJ may, but does not need to, explain how he considered the other three factors. *Id*.

As always, the ALJ's decision must build an accurate and "logical bridge between the evidence and the ALJ's conclusion that [a medical] opinion," *Oakes v. Kijakazi*, 70 F.4th 207, 214 (4th Cir. 2023), is or is not "persuasive" evidence of the claimant's allegedly disabling medical condition, *see id*. at 212–13. When the court is "'left to guess' as to how the ALJ reached her evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot "review the reasonableness of her conclusions." *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018). This regulation is more flexible than its predecessor, which required ALJs to evaluate "treating source" medical opinions under a special two-part standard and to explicitly consider each of five regulatory factors when assigning specific weights to every medical opinion in the claimant's record. *See*, *e.g.*, *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d 377, 384–85 (4th Cir. 2021) (citing 20 C.F.R. § 404.1527(c) (2016)).

The ALJ's evaluations of the medical opinions of Laura's treating physicians are not supported by substantial evidence. *See* R. 23–26. The analysis of each opinion suffers from the

same error. Specifically, although the ALJ loosely references the supportability and consistency of the medical opinions at issue, she failed to provide a sufficient narrative discussion linking the evidence to her conclusions regarding the consistency factor. *See Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). For example, the ALJ determined that each of the medical opinions at issue were not consistent with Laura's medical records and clinical examination findings. *See* R. 23–24. In support of such conclusions, the ALJ provides a selected list of medical findings – with no citations to the record – that apparently contradict the medical opinions. *Id*. But missing from the decision is the ALJ's discussion and analysis of the how the opinions are not consistent with the cited medical evidence leaving the court to make only assumptions which are not included in the opinion. *See Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016). Although the ALJ goes a step beyond the ALJ in *Monroe* by including a reference to some medical findings in the record, there is not sufficient analysis and discussion to permit the court meaningful review. Accordingly, remand is warranted on this issue.

## II.     Function-By-Function Analysis

Laura claims the ALJ failed to engage in a sufficient function-by-function analysis in determining her RFC. ECF No. 10 at 10–13. Specifically, Laura claims the ALJ failed to address limitations regarding her ability to rotate her head and to lift, carry, sit, and stand/walk on a sustained basis. *Id*. Laura further claims the ALJ failed to address how she reached her conclusion regarding Laura's limitations of the use of her left upper extremity in the RFC. *Id*.

The ALJ is required to develop an adequate RFC that accounts for the work activities the claimant can perform given the physical or mental impairments affecting herability to work. *See* SSR 96-8p, 61 Fed. Reg. at 34476 (July 2, 1996). An RFC assessment "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related

activities." *Id*. To comply with the function-by-function analysis, the ALJ must provide a narrative

discussion describing "how the evidence supports each conclusion, citing specific medical facts

(e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*.; *see*

*also Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015).

The ALJ "must discuss the individual's ability to perform sustained work activities in an

ordinary work setting on a regular and continuing basis" and detail "the maximum amount of each

work-related activity the individual can perform based on the evidence available in the case

record." SSR 96-8P, 61 Fed. Reg. at 34478; *see also Monroe v. Colvin*, 826 F.3d 176, 189 (4th

Cir. 2016). Ultimately, the ALJ must explain the conclusions reached and any inconsistencies or

ambiguities in the evidence. *See* SSR 96-8P, 61 Fed. Reg. at 34478; *Monroe*, 826 F.3d at 189.

At the outset, and similar to the above findings regarding the assessment of Laura's treating

physician opinions, the ALJ's decision does not include the narrative discussion connecting the

evidence to her conclusions regarding Laura's RFC. As such, the court is left with insufficient

information to allow for meaningful review. Specifically, although the ALJ cited objective medical

evidence, including a summary of Laura's medical history, as well as nonmedical evidence, such

as Laura's testimony and daily activities, *see* R. 20–23, there is minimum analysis, if any at all, on

how the ALJ determined Laura's RFC. *See Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019)

("[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3)

conclusion.").

Rather, the ALJ concluded that Laura could perform "light work"[6] and focused solely on

evidence that she found credible and consistent for this finding without the required discussion of

---

[6] Pursuant to 20 C.F.R. § 404.1567(b),

> "Light work involves lifting no more than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very

contradictory evidence in the record. In short, the ALJ never explained how she concluded – based on the summarized evidence – that Laura could *actually* perform the tasks required by "light work." *See Woods*, 888 F.3d at 694.

For example, as noted in Laura's brief, the ALJ failed to address Laura's ability to lift, carry, sit, stand, or walk for an 8-hour workday. ECF No. 10 at 12–13. Other than the summary of Laura's testimony and medical records on the issue, there is no discussion addressing Laura's functional ability to lift, carry, sit, stand, or walk during a workday. Rather, it appears, but it is not clear, that the ALJ solely relied upon her conclusion that the state agency medical opinions were persuasive which opined that Laura could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, and could sit, stand, or walk for about 6 hours in an 8-hour workday. *See* R. 25–26. If so, such determination is especially problematic in that the treating physician opinions, which opined the opposite, were not properly considered, as discussed above. In either case, the court can only participate in guesswork and is unable to engage in a meaningful review as the ALJ failed to include a discussion regarding Laura's limitations on lifting, carrying, sitting, standing, or walking.

Laura also claims the ALJ failed to address her ability to rotate her head during an 8-hour workday. ECF No. 10 at 11. There is a notable lack of any discussion on this issue, especially with the medical evidence, Laura's testimony, and Dr. Baylor's opinion regarding her inability to turn her head side to side or look down for prolonged periods without significant pain. *See* 197–98; 367; 370; 446–51; 677–80; 989; 1003–09; 1056–57; 1166–77. As there is no limitation in the RFC regarding Laura's ability to rotate her head, and there is no discussion of the same, the court is

---

little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

unable to determine exactly how the ALJ reached her conclusion that no limitation was necessary. *See Mascio*, 780 F.3d. at 636.

Lastly, Laura claims the ALJ failed to explain how or why she concluded in the RFC that Laura is limited to occasional reaching and frequent fingering and handling with the left upper extremity. ECF No. 10 at 11–12. This error is the same as discussed above – the ALJ included elements one (evidence) and three (conclusion) as outlined in *Thomas* but failed to satisfy element two (logical explanation). *Thomas*, 916 F.3d at 311. As such, the court is unable to determine how the ALJ concluded such limitations were proper in Laura's RFC.

In sum, the court is left to guess about how the ALJ arrived at Laura's RFC because the ALJ's findings do not include a narrative discussion that explain the conclusions she reached and any inconsistencies in the evidence. *See* SSR 96-8p, 61 Fed. Reg. at 34478. Even if such conclusions regarding Laura's RFC are appropriate, this Court cannot meaningfully review how the ALJ came to such a result without the required discussion and analysis to create a "logical bridge" from the evidence to her conclusions. Accordingly, remand is warranted.

<u>CONCLUSION</u>

The ALJ's decision insufficiently explains her conclusions on the above crucial issues. These errors frustrate judicial review and, accordingly, this case should be remanded to the Commissioner for further proceedings. *See* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").[7] Therefore, I respectfully recommend that the presiding District Judge

---

[7] As remand is warranted based on the ALJ's failure to adequately explain her decision regarding Laura's treating physician medical opinions and Laura's RFC, Laura's additional allegation of error regarding additional evidence submitted to the Appeals Council will not be decided. *See Boone v. Barnhart*, 353 F.3d

**REVERSE** and **REMAND** the Commissioner's final decision denying Laura's DIB claim and

**DISMISS** this case from the Court's active docket.

### <u>NOTICE TO PARTIES</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party must serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual

recitations or findings, as well as to the conclusion reached by the undersigned, may be construed

by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered: August 5, 2024

C. Kailani Memmer
United States Magistrate Judge

---

203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address plaintiff's additional arguments).